IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
APR - 6 2021
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

VERNON LAVOIE,

Defendant.

Case No. 1:21-mj-113 (JFA)

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Cassidy Smith, being first duly sworn, hereby depose and state:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI") since September 2018. I am assigned to a white-collar crime squad at the FBI's Washington Field Office. As a federal agent, I am authorized to investigate violations of laws of the United States and execute search and arrest warrants. Prior to my employment with the FBI, I was employed as a Special Agent of the United States Secret Service ("USSS"), where I was assigned to the Financial Crimes Task Force.

2. During my employment with the FBI and USSS, I have investigated frauds committed against financial institutions, private businesses, and individuals. I have investigated financial crimes such as wire fraud, bank fraud, and money laundering, and other related federal violations. I have training and experience in the enforcement of the laws of the United States, including the preparation and execution of search and arrest warrants. I am one of the FBI case agents assigned to the investigation of Vernon Lavoie ("LAVOIE").

3. Unless otherwise stated, the information in this affidavit is either personally known to me, has been provided to me by other individuals, or is based on a review of various documents, records, and reports. During the investigation, I have, among other things, interviewed witnesses and reviewed financial records and public records. Because this affidavit is submitted for the limited purpose of establishing probable cause to support an application for a seizure warrant, it does not contain every fact known by me or the United States. The dates listed in this affidavit should be read as "on or about" dates.

4. This affidavit is submitted in support of a criminal complaint and arrest warrant charging LAVOIE with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. I respectfully submit that this affidavit establishes probable cause to believe that from at least in and around February 2020, until in and around August 2020, LAVOIE participated in a scheme to commit wire fraud.

## SUMMARY OF THE INVESTIGATION

5. On February 15, 2020, two identity theft victims ("Victim 1") and ("Victim 2"), were impersonated. The impersonators signed a contract to sell Victim 1 and Victim 2's property, located on West Euclid Avenue, Tampa, Florida ("Euclid Property"), to a business operating as an LLC ("Buyer 1"). This contract to sell the Euclid Property was signed without Victim 1 and 2's knowledge or consent. The individual impersonating Victim 1 used a Florida driver's license with Victim 1's personal information and a picture of a male subject that was later identified as LAVOIE. The subject impersonating Victim 2 used a Florida driver's license and a picture of an unknown woman ("Unknown Woman"). Law enforcement determined that both Florida licenses used by Victim 1 and 2's impersonators were fraudulent.

6. On March 6, 2020, the home of another identity theft victim ("Victim 3"), located on Lexington Street, Sarasota, Florida ("Lexington Property"), was sold without Victim 3's knowledge or consent to a business operating as an LLC ("Buyer 2"). An individual impersonating Victim 3 appeared in person in front of a notary public in Pinellas County, Florida, to sign the closing documents for the sale of the Lexington Property, and presented the notary public with a Florida driver's license, which law enforcement later determined to be fraudulent. Law enforcement have identified LAVOIE as the impersonator and the person in the photograph on the fraudulent Florida driver's license.

7. On March 12, 2020, proceeds for the fraudulent sale of the Lexington Property were wired to a bank account fraudulently opened in Victim 3's name and social security number and the date of birth of an additional identity theft victim ("Additional Victim") with a similar name. Law enforcement later obtained video footage, showing LAVOIE conducting three cash withdrawals of the fraudulently obtained proceeds from the sale of the Lexington Property out of the account opened in Victim 3's name.

8. On April 13, 2020, the home of a deceased identity theft victim ("Victim 4") located on East 17th Avenue, Tampa, Florida ("East 17th Property"), was sold without the consent of Victim 4's estate to a business operating as an LLC that purchases and renovates homes for military veterans ("Buyer 3"). An individual impersonating Victim 4 appeared in person in front of a notary public located in Pinellas County, Florida, to sign the closing documents for the sale of the East 17th Property and presented the notary public with a Florida driver's license, which law enforcement later determined to be fraudulent. The fraudulent Florida driver's license listed Victim 4's name and the date of birth of a Florida Resident ("Florida Resident 1") with a similar name (though, it is not known whether this person is a victim) and a

photograph of the same Unknown Woman, which was also used in the sale of the Euclid Property discussed in paragraph 5.

9. On April 13, 2020, the proceeds for the fraudulent sale of the East 17th Property were sent to a bank account opened in Victim 4's name and the date of birth of a different Florida Resident ("Florida Resident 2") with a similar name (though, it is not known whether this person is a victim). Once the funds reached this bank account, unknown individuals withdrew most of the funds through cash withdrawals.

10. On April 30, 2020, two additional identity theft victims, Victim 5 and Victim 6, were impersonated. The impersonators signed a contract to sell Victim 5 and 6's property located on Melville Lane, Fairfax, Virginia ("Melville Property"), which is located in the Eastern District of Virginia, to a business ("Buyer 4"). The same email address used for the fraudulent sale of the Woodhaven Property (see paragraph 11) was also used for the communications in the attempted fraudulent sale of the Melville Property.

11. On May 12, 2020, the home of another identity theft victim ("Victim 7"), located on Woodhaven Drive, Fairfax, Virginia ("Woodhaven Property"), was sold without his knowledge or consent to a business operating as an LLC ("Buyer 5"). An individual impersonating Victim 7 appeared in front of a notary public located in Pinellas County Florida, to sign the closing paperwork for the sale of the Woodhaven Property. The Florida driver's license presented to the notary public, which law enforcement later determined to be fraudulent, displayed Victim 7's name, a date of birth of a Florida Resident ("Florida Resident 3") with a similar name (though, it is not known whether this person is a victim), and the same picture of LAVOIE that was displayed on the fraudulent driver's license cards in Victim 1 and Victim 3's name.

12. On May 12, 2020, the proceeds for the fraudulent sale of the Woodhaven Property were sent to a bank account opened in Victim 7's name and the date of birth of Florida Resident 3. Once the funds reached this bank account, unknown individuals made several cash withdrawals and transfers to other financial accounts, including the same account that was fraudulently opened in Victim 4's name to receive the proceeds from the sale of the East 17th Property.

13. On August 12, 2020, the Sarasota County Sherriff's Office obtained an arrest warrant for LAVOIE in the Circuit Court for Sarasota County for the fraudulent sale of the Lexington Property. LAVOIE was charged with violating Florida statutes 817.034(4A1) Scheme to Defraud $50k or more, 817.568(11) Criminal Use of Personal ID (VIC 60 YOA or older), 817.545(2) Mortgage Fraud less than 100k, and 831.29 Counterfeiting of a Driver License.

14. LAVOIE was arrested on August 12, 2020. He is currently detained at the Sarasota County Sheriff's Office Jail. On January 7, 2021, I interviewed LAVOIE at the Sarasota County Sheriff's Office Jail, this interview is described in more detail below (see paragraphs 56 through 62). During his interview and prior to me asking any questions and reading LAVOIE his rights, LAVOIE stated "I made a mistake. If I would've known and wasn't in a bad situation, I probably wouldn't have did [*sic*] it."

## PROBABLE CAUSE

### A. Overview of the Investigation

15. I submit there is probable cause to believe that LAVOIE participated in a scheme to defraud and commit wire fraud. More specifically, that LAVOIE and his co-conspirators unlawfully used victims' personal identifiers to forge documents, forge identification cards, and fraudulently open financial accounts, mailboxes, and email accounts for the purposes of inducing

the fraudulent sale of properties and then collecting the profits from the fraudulently sold property.

16. Once co-conspirators obtained the personal identifiers of the targeted victims and the information on their property, the co-conspirators created fraudulent documents and then communicated with companies that purchase and flip properties to negotiate the sale of the properties. All documents for the attempted sale of the Euclid and Melville Properties, and actual sale of the Lexington Property, East 17th Property, and Woodhaven Property, were shared and signed electronically through applications such as DocuSign, HelloSign, and Dotloop, which require the use of an email address. With the use of these internet applications, the sellers are only required to appear in person one time to sign the final closing paperwork in front of a notary public.

17. In addition to the documents for the fraudulent sale of these properties sent through email, communications about the sale of these properties with the title companies and purchasing businesses were also conducted through email. Some of the communications between the title companies, the buyers, and the fraudulent sellers of the properties were done over the phone. The title company and buyer of the Woodhaven Property were located inside the Eastern District of Virginia at the time of their communications with the fraudulent sellers. As described further below, the email addresses and phone numbers used by the imposters are overlapping and connect the various properties.

18. A Florida driver's license bearing LAVOIE's photograph was presented during the signing of the closing documents for the sale of both the Lexington Property and the Woodhaven Property. Additionally, a Florida driver's license bearing LAVOIE's photograph was used in the

attempted sale of the Euclid Property, and the opening of a mailbox that was used as the address for the bank account opened to collect the proceeds in the sale of the East 17th Property.

19.     After the proceeds for the sale of the Lexington Property, East 17th Property, and the Woodhaven Property were wired into the fraudulently opened accounts, most of the funds were withdrawn through internal transfers to other fraudulently opened accounts and cash withdrawals. LAVOIE completed at least three of these cash withdrawals, which are captured on video surveillance.

B.      Euclid Property

20.     On February 15, 2020, impersonators of Victim 1 and 2 signed a contract for the sale of the Euclid Property to Buyer 1 for $100,000. This sale was completed without Victim 1 and 2's knowledge and consent. The individual impersonating Victim 1 used a fraudulent Florida driver's license with Victim 1's personal information and a picture of LAVOIE. The subject impersonating Victim 2 used a fraudulent Florida driver's license with Victim 2's personal information and a picture of the Unknown Woman.

21.     The communications between the Victim 1 and 2 impersonators and the Title Company ("Title Company 1") that coordinated the attempted fraudulent sale of the Euclid Property were done through an identified email address and a phone number ending in 2274.

22.     On February 28, 2020, Victim 1 and 2 observed an individual ("Contractor 1") changing the locks of the Euclid Property. On the same date, the Tampa Police Department intervened, and the fraudulent sale of Euclid Property was canceled.

23.     Law enforcement interviewed Victims 1 and 2, who informed law enforcement that they did not authorize the sale of the Euclid Property. Victim 1 also informed law

enforcement that he and Victim 2 did not know LAVOIE or the email address used to communicate with Title Company 1.

### C. Lexington Property

24. On March 6, 2020, the Lexington Property belonging to Victim 3 was sold without his knowledge or consent to Buyer 2 for approximately $62,847. This sale was handled by a Title Company ("Title Company 2"). On March 9, 2020, Buyer 2 sent a wire transfer of $88,408.46 from their Fifth Third Bank account ending in -6984 to Title Company 2's escrow account, City National Bank of Florida account ending in -9314 ("City National account -9314"). This amount included the agreed upon sale price and all the associated fees.

25. On March 10, 2020, LAVOIE appeared in front of a notary public in Pinellas County, Florida, with a fraudulent Florida driver's license bearing Victim 3's name and date of birth, and LAVOIE's picture. LAVOIE signed all closing paperwork associated with the sale of the Lexington Property. During his interview with the FBI, LAVOIE stated he received a few thousand dollars for signing paperwork in front of a notary public, but that he was unaware that the paperwork was related to the sale of a home (see paragraphs 56 through 62 for further details).

26. On March 12, 2020, a SunTrust account ending in -1936 ("SunTrust account -1936") was opened in Victim 3's name and social security number, and the Additional Victim's date of birth. Additionally, the phone number ending in 2274 and a known email address were used to open SunTrust account -1936, the same email and phone number used in the attempted sale of the Euclid Property.

27. Additionally, on March 12, 2020, Title Company 2 sent the proceeds of the sale of the Lexington Property through a wire transfer in the amount of $58,785.43 from City National account -9314 to SunTrust account -1936, the account fraudulently opened in Victim 3's name.

On March 16, 2020, LAVOIE was observed on video surveillance conducting three cash withdrawals from SunTrust account -1936 in the amounts of $14,000, $10,000, and $8,000. In his interview with the FBI, LAVOIE stated, "The camera was right there in front of my face. I knew I was going to jail then. I already knew right there." (see paragraphs 56 to 62).

28. All communications between Victim 3's impersonator and Title Company 2 related to the fraudulent sale of the Lexington Property were done through the same phone number used to open SunTrust Account -1936 in Victim 3's name, and in the attempted sale of the Euclid Property. Additional communications about the fraudulent sale of the Lexington Property were made through email between Title Company 2 and Victim 3's purported son, "Zack Mullin."

29. Law enforcement interviewed Victim 3, who stated that he was not familiar with LAVOIE, "Zack Mullin," and the email address used to open SunTrust Account -1936. Victim 3 stated that he did not authorize anyone to sell his Lexington Property or to open any financial accounts in his name. Law enforcement also interviewed the Additional Victim whose date of birth was used to open SunTrust Account -1936. The Additional Victim confirmed that he did not authorize anyone to open any financial accounts in his name.

D. East 17th Property

30. On May 29, 2019, Victim 4 died. At the time of her death, Victim 4 owned numerous properties. In October 2019, an attorney ("Attorney 1") was appointed as the curator of Victim 4's estate and responsible for managing Victim 4's properties.

31. On March 14, 2020, a UPS store mailbox located on Tuttle Avenue, Sarasota, Florida ("Tuttle Mailbox") was opened in Victim 3 and 4's name. The subject impersonating Victim 4 used a fraudulent Florida driver's license bearing Victim 4's name, Florida Resident 1's

date of birth, the East 17th Property's address, and the picture of the Unknown Woman. The individual impersonating Victim 3 used a fraudulent Florida driver's license bearing Victim 3's name, the Additional Victim's date of birth, the Lexington Property's address, and a picture of LAVOIE. Additionally, the phone number ending in 2274 was used to open the Tuttle Mailbox, which is the same phone number used in the fraudulent sale of the Lexington Property and attempted sale of Euclid Property.

32.  On April 9, 2020, a JP Morgan Chase account ending in -3135 ("JPMC account -3135") was opened with Victim 4's name and Florida Resident 2's date of birth. Originally, the address used to open JPMC account -3135 was the address for the East 17th Property; however, the address was changed to the Tuttle Mailbox. The Lexington Property address was also used as a secondary address for the Tuttle Mailbox.

33.  On April 13, 2020, the East 17th Property, belonging to Victim 4's Estate was sold without Attorney 1's knowledge or consent to Buyer 3 for approximately $24,000, this sale was handled by a Title Company ("Title Company 3"). Also, on April 13, 2020, an unidentified female appeared in front of a notary public in Pinellas County, Florida, and presented a fraudulent Florida driver's license bearing Victim 4's name, Florida Resident 1's date of birth, and the picture of the Unknown Woman. Further, this was the same fraudulent Florida driver's license used to open the Tuttle Mailbox and the same picture used in the fraudulent Florida driver's license for Victim 2 in the attempted sale of the Euclid Property. The closing paperwork signed by the unidentified female included a General Warranty Deed for the East 17th Property and the witness to this signature was a male impersonating Victim 3.

34. On April 13, 2020, Title Company 3 sent the closing proceeds for the fraudulent sale of the East 17th Property, totaling $20,082.85, in the form of a wire transfer from their Bank OZK account ending in -7273 to JPMC account -3135, the account opened in Victim 4's name.

35. All communications between Victim 4's impersonator and Title Company 3 related to the fraudulent sale of the East 17th Property, were done through the same email address used in the attempted sale of the Euclid Property and the opening of the SunTrust account -1936 in Victim 3's name.

36. Law enforcement interviewed Attorney 1, who stated that the East 17th Property was sold without her knowledge or authorization.

E. Woodhaven Property (Located in Fairfax County)

37. On April 9, 2020, a UPS store mailbox located on Fruitville Road, Sarasota, Florida ("Fruitville Mailbox") was opened in Victim 3's name, the Lexington Property's address, and a phone number ending in 9117. Additionally, the driver's license number used to open the Fruitville Mailbox was also used to open the Tuttle Mailbox.

38. On April 15, 2020, Buyer 5, located in Arlington County, Virginia, within the Eastern District of Virginia, was contacted by "Elijah Holden." "Elijah Holden" represented that he was Victim 7's purported son-in-law and stated that Victim 7 was ill and in need of money for medical expenses. As a result, Victim 7 desired to sell the Woodhaven Property, which is in Fairfax County, for $275,000.

39. On April 16, 2020, the sales contract was signed and ratified by both parties for Buyer 5 to purchase the Woodhaven Property and a Title Company located in Fairfax County handled the paperwork and closing of this transaction ("Title Company 4").

40. "Elijah Holden" claimed that the email account he used was a shared family email address. All documents for the sale of the Woodhaven Property were sent to the individual impersonating Victim 7 at the purported family email address. "Elijah Holden" also used the phone number ending in 9117 and two additional phone numbers for communications with Buyer 5 and Title Company 4.

41. On April 16, 2020, "Elijah Holden" communicated through text messages from the phone number ending in 9117 with Buyer 5 regarding the contact for the Woodhaven Property. On the same day, Buyer 5 attempted to arrange the retrieval of the keys for the Woodhaven Property via text messages. On April 18, 2020, "Elijah Holden" advised Buyer 5 via text message to get a locksmith because they were no longer in possession of the keys to the Woodhaven Property.

42. On April 22, 2020, a JP Morgan Chase account ending in -8578 ("JPMC account -8578") was opened in Victim 7's name, Florida Resident 3's date of birth, and the Fruitville Mailbox's address.

43. On May 1, 2020, a JPMC account ending in -8894 ("JPMC account -8894") was opened with an additional victim's name and date of birth ("Victim 8"). The address for the Fruitville Mailbox was also used for this account, which is the same address associated with JPMC account -8578 opened in Victim 7's name.

44. On May 7, 2020, Title Company 4, located in Fairfax County, in the Eastern District of Virginia, sent the closing documents for the sale of the Woodhaven Property via email to the purported family email address. On the same day, Victim 7's impersonators sent these same closing documents and a mailing label provided by Title Company 4 to an email address for a UPS Store located in Pinellas County, Florida. Also, on the same day, Victim 7's impersonator

appeared in front of a notary public in Pinellas County, Florida, and signed the closing documents for the sale of the Woodhaven Property.

45. On May 11, 2020, Buyer 5 signed the second general addendum and all closing documents for the purchase of the Woodhaven Property at Title Company 4's office, located in Fairfax County. On the same date, the second general addendum was sent by Buyer 5 to the purported shared family email address through DocuSign and signed by Victim 7's impersonator.

46. On May 12, 2020, the Woodhaven Property belonging to Victim 7 was sold without his knowledge or consent to Buyer 5 for approximately $275,000. On the same date, Title Company 4 sent the closing proceeds totaling $251,511.68 in the form of a wire transfer from their Capital One Bank account ending in -8011 to JPMC account -8578, which is the account opened in Victim 7's name.

47. On May 22, 2020, approximately $65,425 was transferred from JPMC account -8578 to JPMC account -8894 in Victim 8's name. Also, on May 22, 2020, approximately $75,689 was transferred from JPMC account -8578 to JPMC account -3135, which was the account opened in Victim 4's name that received the proceeds from the fraudulent sale of the East 17th Property.

48. On June 4, 2020, four MoneyGram money orders purchased in Victim 4's name and paid to the order of Victim 7, were deposited into JPMC account -8578, via an ATM located on Lockwood Ridge Road, Sarasota, Florida. The Tuttle Mailbox address was listed on all four money orders.

49. Also, on June 4, 2020, two MoneyGram money orders purchased in Victim 4's name and paid to the order of Victim 7, were deposited into JPMC account -8578 via an ATM

located on Bee Ridge Road, Sarasota, Florida. The address listed on these money orders was the address for the East 17th Property.

50. Law enforcement interviewed Victim 7, who stated his property was sold without his knowledge or consent. Victim 7 also stated that he was not familiar with the so-called family email and does not have a son-in-law named Elijah.

F. Melville Property

51. On April 30, 2020, impersonators of Victim 6 signed a contract to sell the Melville Property. On May 1, 2020, the same sales contract was signed by Victim 5's impersonator and ratified by both parties for Buyer 4 to purchase the Melville Property, and a Title Company handled the paperwork and closing of this transaction ("Title Company 5"). This was done without Victim 5's knowledge or consent.

52. The communications between Victim 5 and 6's impersonators and Title Company 5 were done so through the same so-called family email address used for the fraudulent sale of the Woodhaven Property.

53. During the attempt to purchase the Melville Property, Buyer 4 communicated with "Elija Holden," Victim 5 and 6's purported son-in-law, through a phone number ending in 9117. This phone number was also listed on the contract for the sale of the Melville Property. Additionally, this is the same phone number used to open the Fruitville Mailbox and the phone number used by "Elijah Holden," the purported son-in-law of Victim 7, for the fraudulent sale of the Woodhaven Property.

54. On May 14, 2020, Title Company 5 canceled the attempted sale of the Melville Property due to suspected fraud. Title Company 5 believed someone was impersonating Victims 5 and 6 after a failure to produce requested documents.

55. Law enforcement interviewed Victims 5 and 6, who stated they did not authorize anyone to sell their home. Victims 5 and 6 further stated that they were unfamiliar with LAVOIE or the so-called family email address.

G. Law Enforcement Interview of Lavoie

56. As stated above, on January 7, 2021, I interviewed LAVOIE at the Sarasota County Sheriff's Office Jail. At the time of the interview, I was only aware of the fraud associated with the Lexington Property, the Woodhaven Property, and one additional attempted fraudulent sale of a property not mentioned in this affidavit. As a result, I only asked questions related to those properties.

57. Upon entering a room to meet with LAVOIE, and prior to reading LAVOIE his rights or asking LAVOIE questions, LAVOIE spontaneously stated "I made a mistake. If I would've known and wasn't in a bad situation, I probably wouldn't have did [sic] it."

58. After I read LAVOIE his rights and he waived his rights, LAVOIE both admitted to and denied his involvement in parts of the conspiracy. LAVOIE admitted to receiving a few thousand dollars for signing paperwork in front of a mobile notary public. However, LAVOIE stated that when he signed the documents, he was not aware the paperwork was related to the sale of a home or that the homeowner was 78 years old. He further stated that if he would have been aware of these facts, he would not have signed the paperwork. LAVOIE admitted that he discovered the paperwork was related to the sale of a home when he received his payment, as the funds were the proceeds for said sale. LAVOIE also stated he believed the homeowner was his age because the identification card he presented to the notary public listed 1965 as the year of birth.[1]

---

[1] The fraudulent Florida driver's license LAVOIE presented to the notary public during the closing of the Lexington Property displayed the birth year 1942. However, the Florida driver's

59. When asked about the sale of the Woodhaven Property, LAVOIE recognized the name of Victim 7; however, he denied any involvement with the sale of his Woodhaven Property. When asked about his picture on the identification card, LAVOIE stated he never noticed the names on the cards that he was provided. LAVOIE also stated he only went to a notary public one time, and in the same sentence stated possibly twice. LAVOIE later stated he appeared in front of a notary public a few times and then corrected himself by stating that he only appeared in front of a notary public twice. LAVOIE stated that he believed the two different signings in front of the notary public were related to the Lexington Property; he denied any involvement with any other properties.

60. LAVOIE denied any involvement in making the fraudulent identification card he presented to the notary public. LAVOIE stated his co-conspirators took him to a Goodwill to purchase a suit, took his picture in the suit, and this was the picture that appeared on the identification card used in the sale of the Lexington Property.

61. LAVOIE denied opening any bank accounts. LAVOIE stated his co-conspirators drove him to the bank, handed him an identification card to use, and gave him instructions. When LAVOIE returned from the bank to his co-conspirator's vehicle, he returned the identification card and any withdrawn funds to the co-conspirators. LAVOIE admitted to traveling with the co-conspirators to a SunTrust bank and withdrawing $12,000 and $14,000 on separate occasions. When asked about three specific checks written from SunTrust account -1936 and made payable to Unknown Individual 1, Unknown Individual 2, and Unknown Induvial 3, LAVOIE stated he remembered obtaining the checks but that he was unfamiliar with Individuals 1, 2, and 3.

---

license used to open the Tuttle Mailbox displayed the birth year of 1965. Both driver's licenses displayed the same name. This would suggest that LAVOIE possessed both fraudulent driver's licenses.

LAVOIE did state that the names of Individuals 1, 2, and 3 and specific amounts were written on a piece of paper for him.

62. LAVOIE further stated that he was not familiar with the known email address connected to the opening of SunTrust account -1936. LAVOIE also denied making any phone calls related to this fraud scheme or completing anything online. LAVOIE stated that between March and August 2020, his co-conspirators contacted him about different jobs, but he did not participate in them. LAVOIE also stated he was not the "mastermind" of this scheme and mainly "did it" to keep him and his wife off the streets.

## CONCLUSION

63. Based on the above facts, I submit that there is probable cause to believe that from a date unknown, but by at least in and around February 2020 until in and around August 2020, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, the defendant, VERNON LAVOIE, unlawfully and knowingly combined, conspired, confederated, and agreed with others, both known and unknown, to execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and did transmit or caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1349. More specifically, that LAVOIE engaged in a scheme to defraud individual victims, businesses, and financial institutions by using numerous victims personal identifying information to induce the fraudulent sale of properties and open financial accounts to obtain those funds.

Respectfully submitted,

*SA Cassidy Smith*
Cassidy Smith
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone this 6th of April, 2021

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge